UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TAWNYA MICHAEL,                         )
                                        )
        Plaintiff,                      )
                                        )
    vs.                                 )        Case No. 4:05CV02400 ERW
                                        )
AMERICAN INTERNATIONAL                  )
GROUP, INC., et al.,                    )
                                        )
        Defendants.                     )

## MEMORANDUM AND ORDER

This matter comes before the Court on Motion for Summary Judgment [doc. #98], American International Group, Inc., American International Group, Inc. Long Term Disability Plan and American International Life Assurance Company of New York's Motion for Summary Judgment [doc. #100], Plaintiff's Motion for Summary Judgment [doc. #102], Plaintiff's Motion for Leave to File Supplemental Motion for Summary Judgment [doc. #116], Plaintiff's Combined Motion to Strike New Assertion of Fact and Arguments First Presented in Defendant DRMS' Reply Brief in Support of Its Motion for Summary Judgment or, in the alternative, Motion for Leave to File Surreply to Address Such New Assertion of Fact and Arguments and Memorandum in Support Thereof [doc. #117], Plaintiff's Combined Motion to Strike New Assertion of Fact and Arguments First Presented in the AIG Defendants Reply Brief in Support of Its Motion for Summary Judgment or, in the alternative, Motion for Leave to File Surreply to Address Such New Evidence, Assertions of Fact and Arguments and Memorandum in Support Thereof [doc. #118], and Plaintiff's Combined Motion for Leave to Notify the Court of New Authority and Proposed Notice [doc. #122].

Tawnya Michael ("Plaintiff") has brought a three-count complaint against American International Group, Inc. ("Defendant AIG Inc."), American International Group, Inc. Long Term Disability Plan, American International Life Assurance Company of New York (collectively, "AIG Defendants"), Disability Reinsurance Management Services, Inc. ("Defendant DRMS").[1]  Plaintiff alleges that Defendants improperly denied Plaintiff's disability benefits, and asks for retroactive and future disability benefits.  Additionally, Plaintiff seeks to recover for Defendants' alleged failure to produce information and documents, as required by ERISA.  The Parties have all filed cross-motions for summary judgment, and these Motions are currently pending before the Court.

## I.    PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

Plaintiff asserts that on November 20, 2007, after the dispositive motion filing deadline established in the Case Management Order issued by the Court, Defendants first disclosed that an ERISA document that Plaintiffs requested two years earlier exists, but was not produced to Plaintiff.  Plaintiff requests leave to file a supplemental motion for summary judgment, and attached the proposed motion.  The proposed motion has been fully briefed by the Parties, and will be considered by the Court in this Memorandum and Order.

## II.    PLAINTIFF'S MOTION TO STRIKE

Plaintiff asserts that Defendants have asserted new evidence, assertions of fact and arguments in their reply brief in support of their respective Motions for summary judgment and Plaintiff asks that the Court strike this evidence, assertions, and arguments.  The Federal Rules

---

[1]  Hartford Life and Accident Insurance Company was initially named as a Defendant, however, this corporation was voluntarily dismissed from this action on June 22, 2006.

state that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f).

As is evident from the language of this rule, motions to strike may only be directed toward "material contained in pleadings." *Williams ex rel. McIntosh v. City of Beverly Hills, Mo.*, 2007 WL 2792490, at *2 (E.D. Mo. September 24, 2007). The Federal Rules define pleadings as "a complaint and an answer; a reply to a counterclaim . . . ; an answer to a cross claim . . . ; a third-party complaint . . . ; and a third party answer." Fed. R. Civ. P. 7(a). Accordingly, "[m]otions, briefs, memoranda, objections or affidavits may not be" the subject of a motion to strike. *Williams ex rel. McIntosh*, 2007 WL 2792490, at *2; 2 James W. Moore, et al., *Moore's Federal Practice* § 12.37[2] (3rd ed. 2007). Defendants' reply briefs are not pleadings and may not be attacked in this manner. The Court will deny Plaintiff's Motion to Strike. In the alternative, Plaintiff asks that the Court grant leave to file a surreply, and Plaintiff attached the proposed surreply to their Motion. The Court will grant this request.

## III. PLAINTIFF'S MOTION FOR LEAVE TO NOTIFY COURT

Plaintiff asks for leave to notify the Court of new authority, and submitted their Proposed Notice to the Court. Defendants do not oppose Plaintiff's Motion. Accordingly, the Court will Grant Plaintiff's Motion for Leave to Notify the Court of New Authority.

## IV. SUMMARY JUDGMENT: FAILURE TO PRODUCE DOCUMENTS

### A. BACKGROUND FACTS

On or about November 14, 2005, Plaintiff's counsel sent a letter to Defendant DRMS. The letter was not specifically directed to Defendant AIG Inc., but copied to the "Plan Administrator." Plaintiff's counsel states that this terminology was used because they did not yet have a copy of the Plan documents by that time, and they were unsure of the identity of the actual

Plan Administrator. The letter stated that Plaintiff was "sending a copy of this information request to the Plan Administrator as well, since the administrator has certain obligations to supply documentation and perform their fiduciary duties. However, I also request that you provide a copy of this letter directly to the Plan Administrator." Plaintiff's counsel states that the letter was then mailed to Defendant DRMS and Defendant AIG Inc. Plaintiff's counsel has submitted a signed declaration that he mailed the letter to Defendant AIG Inc. at 70 Pine Street, New York, New York 10270. In the declaration, Plaintiff's counsel stated that he had this address from a previous matter.

The letter requested an extension of time for Plaintiff to provide Defendant DRMS with additional medical information pertinent to her appeal. The letter requested that:

> Pursuant to Section 104(b)(4) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Sec. 1024(b)(4), please provide me copies of the plan document, summary plan description, any plan merger documents, the latest annual report, any terminal report, and all trust agreements, contracts together with all other instruments under which the plan is established and/or operated including, but not limited to, all documents mentioned in Section 109(c) of ERISA, 29 U.S.C. Sec. 1029(c).

Defendant AIG Inc. states that they never received a copy of this letter. This letter is not present in Defendant AIG Inc.'s files, and Defendant AIG Inc. states that it is their policy to respond to all requests for documents within 30 days of receipt.

Defendant DRMS did receive this letter, and they responded to the letter on November 29, 2005. In their response, Defendant DRMS provided Plaintiff's counsel with a copy of the Plan and the administrative record as it existed at that time. The Plan identified Defendant AIG Inc. as the "Plan Administrator" and listed the mailing address as 70 Pine Street, New York, New York 10270. Plaintiff states that since the request had already been mailed to Defendant AIG Inc.

at that address, Plaintiff did not send another request.  Defendant AIG Inc. states that they did not

learn of Plaintiff's request until they were served with Plaintiff's Complaint on January 12, 2006.

Defendant AIG Inc. insures the plan through Group Insurance Policy GLT-10761 ("Group

Insurance Policy").  Plaintiff did not receive the Group Insurance Policy from Defendant DRMS,

and Plaintiff's counsel contacted Joseph Hornik, the Assistant General Counsel for Defendant

AIG Inc. on January 13, 2005.  Joseph Hornik responded that he would immediately produce the

Group Insurance Policy.  On January 16, 2005, Plaintiff's counsel received an insurance policy

issued by Hartford Life Insurance Company.  Based on this policy, Plaintiff added Hartford Life

Insurance Company as a defendant.  Plaintiff's counsel later learned that he received an incorrect

insurance policy, and dismissed Hartford Life Insurance Company as a defendant.  Upon learning

that Plaintiff received the wrong insurance policy, Plaintiff filed a Motion for Preliminary

Injunction seeking the correct Group Insurance Policy on May 4, 2006.  Defendants produced the

correct policy on May 15, 2006.  In sum, six months passed from Plaintiff's original request to the

date they actually received the correct policy, and Plaintiff states that she incurred expenses from

adding and dismissing Hartford Life Insurance Company, and from investigating the claims

against Hartford Life Insurance Company.  Defendants ask that summary judgment be granted as

to Plaintiff's claim for statutory penalties related to the Group Insurance Policy, and Plaintiff

responds that summary judgment is not appropriate as there is an issue of genuine material fact.

Additionally, Defendant DRMS did not provide Plaintiff with a copy of an administrative

services contract between Defendant DRMS and Defendant AIG Inc. that allegedly contains a

grant of discretionary authority from Defendant AIG Inc. to Defendant DRMS.  This contract is

the basis for Plaintiff's Supplemental Motion for Summary Judgment.  Plaintiff did not learn of the

existence of this administrative services contract until November 20, 2007.  This administrative

services contract has never been provided to Plaintiff. Plaintiff asserts that summary judgment and the award of statutory penalties are appropriate for Defendants' failure to produce the administrative services contract, and Plaintiff also asks for injunctive relief.

## B.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (*quoting* Fed. R. Civ. P. 1). "By its very terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish "the non-existence of any genuine issue of fact that is material to a judgment in

his favor." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 256-57. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the non-moving party must show there is sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.*

## C.   DISCUSSION

A "plan administrator, upon written request, is required to furnish certain" plan documents to plan participants. *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 946 (8th Cir. 1999); 29 U.S.C. § 1024(b)(4). Specifically, they must provide copies of "the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust

agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4).

The phrase "other instruments" in 29 U.S.C. § 1024 has been defined to include "documents that are 'similar in nature to the class of objects that specifically precedes it' - - 'legal documents that describe the terms of the plan, its financial status, and other documents that restrict or govern a plan's operation.'" *Allen v. Honeywell Retirement Earnings Plan*, 382 F.Supp.2d 1139, 1168 (D. Ariz. 2005) (*quoting Shaver v. Operating Eng'rs Local 428 Pension Trust Fund*, 332 F.3d 1198, 1202 (9th Cir. 2003)). The statute provides for the disclosure of "not any document relating to a plan, but only formal documents that establish or govern the plan." *Brown v. American Life Holdings, Inc.*, 190 F.3d 856, 861 (8th Cir. 1999). This narrow definition has also been embraced by the Second, Fourth and Seventh Circuit Courts. *See Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 142-46 (2d Cir. 1997); *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653 (4th Cir. 1996); *Ames v. American National Can Co.*, 170 F.3d 751 (7th Cir. 1999).

A plan administrator can be penalized under 29 U.S.C. § 1132(c)(1)(B) if they fail to provide the "requested information within thirty days of the request. *Kerr*, 184 F.3d at 946. For a claim for statutory penalties under ERISA, a plaintiff must "prove that: 1) he requested the [plan document] in writing, and 2) [Defendants] failed to provide it." *Id.* at 947. The Court will consider Plaintiff's claims regarding the administrative services contract and the Group Insurance Policy separately.

### 1. Failure to Produce the Administrative Services Contract

Plaintiff's Supplemental Motion for Summary Judgment asserts that summary judgment and the award of statutory penalties is appropriate on Defendants failure to produce an

administrative services contract. Defendants state that Defendant DRMS routinely enters into written administrative services contracts with its clients, such as Defendant AIG Inc., and that this document is a confidential and proprietary business contract. Defendants state that it is not a plan document that governs and controls Plaintiff's claims, and accordingly was not produced to Plaintiff.

ERISA disclosure requirements exist "to ensure that 'the individual participant knows exactly where he stands with respect to the plan." *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1070 (6th Cir. 1062) (*quoting Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 118 (1973)). As a result, "courts should favor disclosure where it would help participants understand their rights." *Bartling*, 29 F.3d at 1070. The proper inquiry for the Court to determine whether the contract at issue should have been disclosed is to consider whether the administrative services agreement "allow[s] 'the individual participant [to] know . . . exactly where he stands with respect to the plan - - what benefits he may be entitled to, what circumstances may preclude him from obtaining benefits, what procedures he must follow to obtain benefits, and who are the persons to whom the management and investment of his plan funds have been entrusted." *Hughes Salaried Retirees Action Comm. v. Administrator of the Hughes Non-Bargaining Retirement Plan*, 72 F.3d 686, 690 (9th Cir. 1995) (*quoting* S.Rep. No. 93-127(1974)).

The Court has not found much guidance from other courts on this issue. Several courts have found that the terms of administrative services agreements cannot be held against a plan participant or administrator because they are not plan documents. *See Fritcher v. Health Care Service Corp.*, 301 F.3d 811, 817 (7th Cir. 2002); *Parente v. Aetna Life Ins. Co.*, 2001 WL 818345, at *7 (E.D. Pa. June 19, 2001). However, this does not automatically result in the conclusion that this document is exempt from ERISA disclosure requirements, because ERISA

requires the disclosure of "the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4).

A more persuasive rationale was used by the District of New Jersey, when the court found that an administrative services agreement was not a formal plan document because it did not "describ[e] health benefits; rather the ASA merely memorialized the obligations [the contracting parties] owed to each other." *Local 56, United Food and Commercial Workers Union v. Campbell Soup Co.*, 898 F.Supp. 1118, 1136 (D.N.J. 1995). However, the Court notes that while it has not seen the administrative services agreement at issue, Defendants state that it contains a provision that purports to grant discretion and authority from AIG Inc. to Defendant DRMS to determine eligibility for benefits and construe and interpret all terms and provisions of the Group Insurance Policy. As a result, this administrative services contract did more than just memorialize the obligations owed between Defendant AIG Inc. and Defendant DRMS, it also contained information on "who are the persons to whom the management . . . of his plan . . . have been entrusted." *Hughes Salaried Retirees Action Comm.*, 72 F.3d at 690. As a result, the Court finds that the administrative services agreement was subject to the ERISA disclosure requirements as it is a document "that restrict[s] or govern[s] a plan's operation." *Allen*, 382 F.Supp.2d at 1168 (*quoting Shaver*, 332 F.3d at 1202).

Additionally, the Court note s that the Eleventh Circuit has found that administrative services contracts may be subject to disclosure under ERISA not just as "other instruments under which the plan is established or operated" but as a "contract" pursuant to 29 U.S.C. § 1024(b)(4). *Heffner v. Blue Cross and Blue Shield of Alabama, Inc.*, 443 F.3d 1330, 1343 (11th Cir. 2006). The Eleventh Circuit succinctly stated that "[a] contract between a group and an insurer such as

Blue Cross is specifically listed as an ERISA document which may control a plan's operation." *Id.* The administrative services agreement at issue before the Court controls the operation of the plan as it purports to grant discretion and authority from Defendant AIG Inc. to Defendant DRMS to determine eligibility for benefits and construe and interpret all terms and provisions of the Group Insurance Policy. The administrative services contract is subject to ERISA's disclosure requirements, and the Court will grant summary judgment on Count I of Plaintiff's Complaint, granting Plaintiff the injunctive relief she seeks. Defendants must produce this document to Plaintiffs within ten days from the date of this order.

The Court notes that Defendants assert that this document is confidential and proprietary. The Court therefore orders that this document be produced through the Court's CM/ECF system. It is to be filed under seal and may be used by the Parties for the purposes of this action only, and may not be disclosed to any third parties.

Plaintiff also asks that the Court award statutory penalties for Defendants failure to disclose this document. Plaintiff seeks statutory penalties pursuant to 29 U.S.C. § 1132(c)(1). This statute provides that a plan administrator who fails to comply with a request for information may be held personally liable for up to $100 for each day after the date of non-compliance. 29 U.S.C. § 1132(c)(1).

On or about November 14, 2005, Plaintiff made a valid request for the administrative services agreement as she asked to be provided with contracts and "all other instruments under which the plan is established and/or operated." *See McGowan v. NJR Service Corp.*, 423 F.3d 241, 250 (3rd Cir. 2005). While Defendant DRMS received this letter, it is not clear that Defendant AIG Inc. received Plaintiff's request. Determining whether Defendant AIG Inc. received Plaintiff's request is important because statutory penalties can only be recovered from a

plan 'administrator.' Under ERISA, the administrator is "the person specifically so designated by the terms of the instrument under which the plan is operated." 29 U.S.C. § 1002(16)(A)(I). This statute does not authorize awards of civil penalties from claim administrators. *See Vanderklok v. Provident Life and Acc. Ins. Co.*, 956 F.2d610 (6th Cir. 1992); *Boldt v. Dow Chemical Co. Voluntary Group Acc. Ins. Plan*, 2007 WL 2329873, at *15 (S.D. Tex. August 15, 2007). The Plan clearly states that American International Group, Inc. is the Plan Administrator. As a result, statutory penalties may only be assessed against Defendant AIG Inc., not Defendant DRMS, and Defendant DRMS's receipt of the letter is irrelevant.

If Defendant AIG Inc. received Plaintiff's request, the Court agrees that statutory penalties would be appropriate beginning thirty-one days after November 14, 2005.[2] If they did not receive the letter, statutory penalties would be calculated beginning thirty-one days after Defendant AIG Inc. was served with Plaintiff's lawsuit. Summary judgment is not appropriate where there exists a "*genuine* issue of *material* fact." *Anderson*, 477 U.S. at 248. Whether this request was sent to and received by Defendant AIG Inc. is a genuine issue of material fact, and the Court cannot grant summary judgment on this claim.

### 2. *Failure to Produce the Group Insurance Policy*

---

[2] While Defendants' original decision that the administrative services agreement did not need to be disclosed may have been made in good faith, a court does not need to find bad faith or actual injury in order to impose penalties under 29 U.S.C. § 1132(c)(1). *Hess v. Hartford Life and Acc. Ins. Co.*, 91 F.Supp.2d 1215, 1225 (C.D. Ill. 2000). Additionally, the Court is troubled by Defendants reliance on this unproduced document in their arguments supporting summary judgment.

"If the court ultimately decides to impose a fine, the statute commits the size of that penalty to the court's discretion." *Id.* Penalty calculations start thirty one days after a request is made, in this instance, the statutory penalties began accruing on December 15, 2005. *See Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1069(6th Cir. 1994). These penalties continue accruing until the administrative services contract is disclosed to Plaintiff.

Defendants ask that the Court grant summary judgment on Count I of Plaintiff's Complaint as it relates to their alleged failure to produce the Group Insurance Policy underlying the plan. They assert that Defendant AIG Inc. never received the request, and that Defendant DRMS responded with the Certificate of Insurance, which is a sufficient substitute for the actual Group Insurance Policy. As discussed above, the Court finds that summary judgment is not appropriate on this claim as there exists a "*genuine* issue of *material* fact." *Anderson*, 477 U.S. at 248.

The Court finds that Defendants were required under ERISA to disclose the Group Insurance Policy. Defendants assert that the Certificate of Insurance was sufficient, as the Certificate of Insurance is part of the Plan. The Court agrees that Defendants were required to disclose the Certificate of Insurance because the Certificate of Insurance was a controlling plan document. *See Paulson v. The Paul Revere Life Ins. Co.*, 323 F. Supp.2d 919, 937 (S.D. Iowa 2004). However, Defendants were also required to disclose the Group Insurance Policy. The Group Insurance Policy defined the term "disability" and other relevant Plan provisions. This demonstrates that the Group Insurance Policy is a legal document "that restrict[s] or govern[s] a plan's operation.'" *Allen*, 382 F.Supp.2d at 1168 (*quoting Shaver*, 332 F.3d at 1202). Other courts have also found that group insurance policies provide plan participants with information concerning the terms and conditions of their plan, and must be disclosed under ERISA. *See Colarusso v. Transcapital Fiscal Systems, Inc.*, 227 F. Supp.2d 243, 258 (D.N.J. 2002); *Staib v. Vaughn Indus., Inc.*, 171 F. Supp.2d 714, 715 (N.D. Ohio 2001).

The Court finds that a genuine issue of material fact exists regarding whether Defendant AIG Inc. received a copy of the letter. A plan administrator who fails to comply with a request for information may be held personally liable for up to $100 for each day after the date of non-

13

compliance. 29 U.S.C. § 1132(c)(1). Statutory penalties can only be recovered from a plan 'administrator.' Under ERISA, the administrator is "the person specifically so designated by the terms of the instrument under which the plan is operated." 29 U.S.C. § 1002(16)(A)(I). This statute does not authorize awards of civil penalties from claim administrators. *See Vanderklok*, 956 F.2d 610; *Boldt*, 2007 WL 2329873, at *15. As a result, statutory penalties are available from Defendant AIG Inc. and not Defendant DRMS, as Defendant AIG Inc. is the plan administrator.

If Defendant AIG Inc. received Plaintiff's request, the Court agrees that statutory penalties would be appropriate beginning thirty-one days after November 14, 2005. If Defendant AIG Inc. did not receive the letter, statutory penalties would be calculated beginning thirty-one days after Defendant AIG Inc. was served with Plaintiff's lawsuit. These penalties would be calculated until May 15, 2006, the date Plaintiff received the correct Group Insurance Policy. Summary judgment is not appropriate where there exists a "*genuine* issue of *material* fact." *Anderson*, 477 U.S. at 248. Whether this request was sent to and received by Defendant AIG Inc. is a genuine issue of material fact, and the Court cannot grant summary judgment on this claim.

## V.    SUMMARY JUDGMENT:  DENIAL OF BENEFITS

### A.    *BACKGROUND FACTS*[3]

#### 1.    *Evidence Added After the Administrative Process Was Deemed to be Exhausted*

---

[3]   The Court's recitation of the facts is taken from Defendant's Statement of Uncontroverted Material Facts and Plaintiff's Response to Defendant's Statement of Material Facts. As discussed below, the Court has excluded statements of fact that rely upon documents or evidence that was not presented prior to the deemed exhaustion of the administrative proceedings.

The Court begins by noting that the Parties dispute the admissibility of certain evidence. In support of their Motions, Defendants rely upon a medical report created by Dr. Kaplan, a vocational consultant's report, a final determination and other documents that were not disclosed in the administrative record. Plaintiff argues that the law of the case doctrine applies and excludes this evidence as Defendants should not be permitted to rely on evidence added to the administrative record after the Court deemed that the administrative process was exhausted.

On June 20, 2006, the Court issued an Order staying this action for 150 days to allow for the completion of the administrative review of Plaintiff's Employee Retirement Income Security Act ("ERISA") disability benefit claim. The June 20, 2006 Order granted Plaintiff sixty days to submit any additional information to Defendant DRMS in support of her benefit claim and appeal. Defendants then had forty-five days, or up to ninety days if special circumstances required additional time, to review any additional information submitted by Plaintiff, conduct any needed investigation, and render a final benefit determination.

On January 23, 2007, the Court conducted a status conference to determine why this case was not moving forward. During the status conference, Defendants claimed that they did not undertake an administrative review of Plaintiff's claim because Plaintiff failed to certify that she did not intend to submit additional documentation in support of her benefit claim and appeal. After considering the Parties' arguments, the Court found that Defendants failed to render a final benefit determination on Plaintiff's benefit claim by August 21, 2006, in contravention of the Court's January 20, 2006 Order, and therefore deemed that Plaintiff had "exhausted the administrative remedies available under the plan." The Court found that as Plaintiff's administrative remedies were exhausted, and Plaintiff could seek relief from the Court.

The Court deemed Plaintiff's administrative remedies to have been exhausted on February 20, 2007. In March, 2007, Defendants attempted to add a report by Dr. Richard Kaplin to the administrative record. Plaintiff filed a Motion on March 30, 2007, seeking to have the Court strike the report of Dr. Kaplan as it was prepared after the Court deemed Plaintiff's administrative claim to have been exhausted. In a Memorandum and Order dated July 31, 2007 the Court denied Plaintiff's Motion as moot, indicating that the report would not be considered.

Despite the Court's order that the administrative remedies were exhausted, and that the Court would not consider a report submitted after the exhaustion, Defendants later purported to add other documents to the administrative record. These documents include a vocational report issued by Ruby MacDonald on June 13, 2007 and Dr. Piper's failure to respond to Defendant's inquiries. Plaintiff did not have the opportunity to respond Dr. Richard Kaplin's report, the vocational report, or Dr. Piper's non-response to Defendants' inquiries, and later, based upon these additional documents, Defendants issued a 'final determination' on Plaintiff's administrative appeal on June 27, 2007.

The Court affirms its July 31, 2007, Memorandum and Order, and accordingly, the disputed documents will not be considered by the Court. An "administrative record should contain only the evidence before the plan administrator at the time it made the decision to deny benefits." *Bishop v. Long Term Disability Income Plan of Sap America, Inc.*, 2008 WL 1944719, at *3 (N.D. Okla. May 1, 2008) (*citing Adamson v. Unum Life Ins. Co. of America*, 455 F.3d 1209, 1214 (10th Cir. 2006). Neither Dr. Richard Kaplin's report, the vocational report, Dr. Piper's failure to respond to Defendants' inquiries, nor the purported 'final determination' is part of the administrative record.

Documents that are not part of the administrative record may be considered by the Court in limited instances. As discussed in more detail below, the standard with which the Court will review the administrative determination at issue in this action is *de novo*. The Eighth Circuit has stated that the "[a]dmission of evidence outside the administrative record is discouraged on de novo review; however, the district court may admit evidence outside the record in a denial of ERISA benefits case if the participant shows good cause." *Ferrari v. Teachers Ins. and Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002).

The Court has not found any Eighth Circuit case law dealing with a plan administrator seeking to supplement the record, but assuming that the standard would be the same, Defendants have failed to show good cause. In determining whether good cause exists, courts focus "in large part on whether [defendant] had an opportunity to present the additional evidence during the administrative proceedings. An opportunity and failure to present the additional evidence shows a lack of good cause." *Sloan v. Hartford Life and Acc. Ins. Co.*, 475 F.3d 999, 1004 (8th Cir. 2007) (*citing Davidson v. Prudential Ins. Co.*, 953 F.2d 1093, 1095 (8th Cir. 1992)). Defendants certainly had the opportunity to present this evidence in the administrative proceedings before the deemed exhaustion. Defendants have failed to show good cause for supplementing the record. Plaintiff's administrative remedies were deemed to have been exhausted on February 20, 2007, and nothing added to the administrative record after that date will be considered by the Court.

### 2. Facts Related to Plaintiff's Long Term Disability Plan

Plaintiff began working for her employer, Defendant AIG Inc., as a Customer Account Specialist in May, 1995. She participated in the Long Term Disability Plan ("Plan") offered by AIG Inc. The Plan is an employee welfare benefit plan governed and controlled by ERISA.

Defendant AIG Inc. is the Plan Administrator and insures the plan through the Group Insurance Policy.

The Plan grants discretion and authority to determine benefit eligibility. Specifically, page 30 of the Plan states:

**Who interprets policy terms and conditions?**

**American International Life Assurance Company of New York** has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

While Defendant AIG Inc. is the plan administrator, Defendant DRMS administers benefit claims under the Plan and Group Insurance Policy. As the claims administrator for the Plan, Defendant DRMS claims to have "full discretion and authority to determine eligibility for benefits and construe and interpret all terms and provisions of the Group Insurance Policy." However, the Group Insurance Policy does not contain any provision allowing Defendant AIG Inc. to delegate their "discretion and authority."

The Group Insurance Policy defines the term "disability" as:

**Disability** or **Disabled** means that:
(1)    during the Elimination Period; and
(2)    for the next 24 months, you are prevented by:
        (a)    accidental bodily injury;
        (b)    sickness;
        (c)    mental illness;
        (d)    substance abuse; or
        (e)    pregnancy,
from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are less than 80% of your Indexed Pre-disability Earnings.
After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

The Group Insurance Policy goes on to define "Your Occupation" as "your occupation as it is recognized in the general workplace. Your occupation does not mean the specific job you are

performing for a specific employer, or at a specific location." The Group Insurance Policy defines "Any Occupation" to mean "an occupation for which you are qualified by education, training or experience."

On June 20, 2002, Plaintiff was rear-ended in an motor vehicle accident, which resulted in Plaintiff suffering a spinal injury and back pain. She underwent surgery on April 21, 2003. The physicians performed a one-level, anterior and posterior "360 global" spinal fusion and bone graft surgery at L5-S1. On September 8, 2003, Plaintiff submitted a claim for benefits under the Plan and Group Insurance Policy for a period of disability beginning March 20, 2003.

After collecting and reviewing Plaintiff's medical records, Defendant DRMS notified Plaintiff by letter dated September 26, 2003 that she was entitled to benefits commencing September 15, 2003 because her records established she was unable to perform the material duties of her own occupation. This letter advised Plaintiff that the Plan and Group Insurance Policy's definition of disability would change after 24-months of paid benefits, such that Plaintiff would then need to provide proof that she is unable to perform the material duties of "any occupation." The letter also advised Plaintiff that Defendant DRMS would "require periodic updates regarding the status of your condition from you and your attending physician."

On August 24, 2005, Defendant DRMS wrote Plaintiff a letter informing her that her disability benefits would be terminated as of August 24, 2005. The denial was because Defendant DRMS found Plaintiff did not meet the Plan's definition of disabled because she was "not totally disabled from her own or any occupation." Plaintiff appealed the termination of her disability benefits. In the appeal process, Plaintiff was permitted to provide Defendant DRMS with additional medical information.

## 2.  *Plaintiff's Relevant Medical History*[4]

At her first post-operative appointment with Dr. Piper,[5] on May 5, 2003,  Plaintiff was reported to be "doing very well," and she was given a refill on her pain medications.  On June 2, 2003, Plaintiff had another appointment with Dr. Piper.  At this appointment she reported that she was experiencing pain at the graft site, and a Lidoderm patch was prescribed.  At her appointment on July 17, 2003, Plaintiff reported swelling in her legs and "left donor site iliac pain."  She was given an injection at the donor site to treat her pain, and instructed to continue physical therapy.  Dr. Piper prescribed sequential stimulation unit for her lumbar spine on August 15, 2003 as part of her spine had not yet fused.

On September 2, 2003, she met with Dr. Piper, and the records from her visit state that Lidoderm was helping the donor site pain, but that she was experiencing discomfort along the midline of her back.  Dr. Piper prescribed a Lidoderm patch for the midline of her back.  On October 13, 2003, the records note a decrease in overall pain, and that Plaintiff has been using "a couple of Vicodin periodically" and is using the Lidoderm patches.  The records state that Plaintiff "is able to go about 30-40 minutes and then has to take it easy."  On October 14, 2003, Dr. Piper prescribed a lumbar unloading brace for Plaintiff.  On October 16, 2003, Dr. Piper prescribed

---

[4] Evidence from Plaintiff's medical records is admissible "under the medical treatment or diagnosis exception to the hearsay rule."  *United States v. Miller*, 477 F.3d 644, 648 (8th Cir. 2007).  The statements the Court relies on below are admissible as they are "reasonably pertinent" to the medical treatment or diagnosis Plaintiff sought.  *Id.* (*quoting United States v. Renville*, 779 F.2d 430, 436-37 (8th Cir. 1985)).

[5] Though her treating physician at St. Peters Bone & Joint Surgery is Dr. Piper, many of the reports from her appointments were written or approved by Chris Hemmer, a nurse practitioner who assists Dr. Piper.  The administrative record states that Plaintiff was referred to Chris Hemmer instead of Dr. Piper, and that Dr. Piper reviews his work.  As it is not clear who Plaintiff saw at any particular appointment, but since Dr. Piper supervises Chris Hemmer, the Court will refer to any appointments at St. Peters Bone & Joint Surgery as appointments with Dr. Piper.

LSO/Compression Stockings for pain reduction, to provide support, to restrict motion, and to reduce the swelling she was experiencing in her legs. Plaintiff met with Dr. Piper on December 8, 2003, and at this appointment she was injected with Depo Medrol, Lidocaine, and Marcaine for pain at the donor site. The notes reveal that she is experiencing intermittent leg swelling.

At her appointment on February 9, 2004, Plaintiff reported that she was still experiencing pain, but the injection from the previous visit was helping quite a bit. She reported taking "a couple of Vicodin a day for chronic discomfort." She met with Dr. Piper again on February 24, 2004, where she was diagnosed with degenerative disc disease of her cervical spine and given a home exercise program as treatment. Plaintiff was cleared to return to work on March 8, 2004, but immediately prior to returning to work, Plaintiff suffered a setback and was unable to get out of bed for six consecutive days.

On June 15, 2004, she saw Dr. Piper, and the records from that visit state that she has improved since her surgery in 2003, and that Plaintiff "has donor site pain over the left posterior iliac crest." An injection was given at the donor site for her pain, and she was prescribed Lidoderm patches for pain and cervical traction.[6] A MRI was ordered to evaluate the degenerative disc disease in her cervical spine. The MRI was performed on June 22, 2004, and it found mild spinal canal stenosis and moderate degenerative disc disease at C5-6 and C6-7. The MRI also found small broad based disc bulges, small posterior vertebral osteophytes, posterior element bony hypertrophy and mild flattening of the spinal cord within the thecal sac. The MRI noted no spinal cord edema and no evidence of nerve root impingement in the neural foramina.

_____

[6] It is unclear if Plaintiff ever started traction. There are notes in the administrative record from October, 2004 that state that traction has not been started.

On October 14, 2004, the report from her appointment with Dr. Piper states that she continues to experience intermittent low back pain that had been treated conservatively with no significant improvement. The pain is described as "over the donor site, myofascial pain, some numbness and tingling into the left leg." The pain was not considered to be postoperative-pain, and a MRI was ordered "to evaluate for adjacent segment problems."

This MRI was conducted on November 2, 2004. It found "marrow signal changes in the L5-S1 level" that were probably degenerative. The MRI found hemangioma or lipoma in T10, and degenerative disc disease at T11-12. The MRI report noted irregular signal intensity at the left iliac bone and the posterior aspect of the residual disc, but the significance was unknown. The signal intensity at the left iliac bone was presumed to be the donor site, and it was noted that the increased signal at the residual disc may represent disc space infection. The MRI found the sacroiliac joints to be unremarkable.

On January 14, 2005, Dr. Piper sent a letter to Defendant DRMS. This letter stated that "because of persistent symptoms and debilitating donor side pain and paraesthesias in both legs despite medications, injections and the like, that ordinary requirements for even a sedentary position would be too exhaustive and taxing." He concludes that he suggested to Plaintiff "that she not return to gainful employment even despite her position being a sedentary one."

On February 17, 2005, Plaintiff again saw Dr. Piper. The records state that the Lidoderm had been working, but that she had developed an allergy to the medication. It notes that Plaintiff has had several injections, but that the pain continues, and that she still occasionally felt tingling in her leg. Dr. Piper set Plaintiff up with a TENS unit for her neck pain. On May 17, 2005, Plaintiff sought treatment from Dr. Piper. The records from this visit state that Plaintiff was doing a little better with the Neurotin and that her pain appeared to wax and wane. The report notes chronic

low back pain and "sciatica status post lumbar fusion" and the decision was made to "get her set up with a pain service" and increase her dosage of Neurotin. The records from her appointment on March 31, 2005 state that the Neurotin seems to be helping Plaintiff's pain, and her dosage was increased.

On June 3, 2005, she met with Dr. Granberg at Pain Management Services. She reported some pain in her neck and severe pain in her back from her left posterior hip, bone graft site, and that this severe pain radiates up and down her spine and into her left anterior thigh and stops at the knee. Dr. Granberg prescribed a series of three left sacroiliac joint injections, and she received her first injection that day. Dr. Granberg also prescribed her Hydrocodone APAP on June 3, 2005. On June 16, 2005, Plaintiff received her second left sacroiliac joint injection. On June 23, 2005, Dr. Granberg again prescribed Hudrocodone APAP for Plaintiff.

On July 12, 2005, Plaintiff participated in a three-hour[7] functional capacity evaluation ("FCE"). The FCE concluded that she was capable of functioning in the Medium Physical Demand Level, but did not meet the maximum requirements for that level over an eight-hour workday. The report found that she did meet the maximum requirements for a Light Physical Demand Job as she was able to perform stooping, repetitive squatting, crouching, kneeling, forward and overhead reaching, stair and ladder climbing, sitting, and walking on a frequent basis, and standing, pushing, pulling, and crawling on an occasional basis, although she would need to interchange sitting, standing and walking on a regular basis. Essentially, the report found that

---

[7] The Parties dispute the length of the FCE. Plaintiff's appointment was for 8:00 a.m. on July 12, 2005. The Court has reviewed the record, and many of the FCE test results include a time stamp from when that test was conducted. The last time stamp was recorded at 10:03 a.m., and while Defendants assert that the length of the FCE is a controverted fact, Defendants have not submitted any evidence that the examination lasted beyond this point.

Plaintiff demonstrated the ability to perform "light work" on a full time basis or "medium work" on less than a full time basis.

The FCE examiner reported that she "gave inconsistent, yet maximal effort" and was in the 'Moderate' category for inappropriate illness behavior, and reported that "today's test appears to be a true representation of this client's current functional capabilities."[8]  This finding is elaborated upon in the report, which states that Plaintiff, "demonstrated consistent and maximal effort as noted by showing the following: heart rate elevated greater than 60% (> 106 bpm) of her age-adjusted heart rate in 4 out of 4 tests, normal kinesio-physical signs and objective signs of difficulty (increased respirations, increased sweating, furrowing of the frontalis muscle . . ."

At the examination she reported severe pain at an intensity of 8, and stated that the pain ranges from 7 to 9, "that prolonged activity or position aggravates her lower back and left leg symptoms." The report made several notations of Plaintiff's pain, stating that Plaintiff "had increased complaints of pain with all of the lifts and the carry . . . [p]ost test, she rates her pain 9/10 with shooting pains in the back of the leg to the knee.  She has numbness in her foot and her back and left hip are aching a lot."  The report also noted that Plaintiff was "crying throughout the entire circuit."

Defendants had a vocational counselor review the FCE results.  The vocational counselor did not determine whether the FCE results were valid, or whether Plaintiff was capable of returning to full-time work on a sustained basis.  Based on the FCE's conclusion that Plaintiff was

---

[8] An inconsistency that was noted in the FCE report was that Plaintiff complained of pain and experienced difficulty pushing a wheeled cart that required 30 pounds of force, but did not complain when asked to isometrically push with 50 pounds of force and pull with a force of 43 pounds.  The report also noted inconsistencies in grip strength and rapid exchange grip strength, and the report noted that 11 of 16 Waddell's signs were negative, placing Plaintiff in the 'moderate' category for inappropriate illness behavior.

capable of meeting the requirements for a Light Physical Demand Job, the vocational counselor looked at Plaintiff's education and experience and concluded that jobs such as tax preparing, sedentary work and light work are available in the St. Louis area.

The day after Plaintiff's FCE, July 13, 2005, Plaintiff received a prescription for Hydrocodone APAP 5/500. This prescription was authorized by Dr. Rahimi as Dr. Granberg was out of the office. Plaintiff received another prescription for that same medication on August 11, 2005 from Dr. Coleman as Dr. Granberg was again out of the office.

Defendant DRMS forwarded a copy of the FCE report to Plaintiff's treating physician, Dr. Piper, on August 5, 2005. They asked that he review the findings and state his medical opinion. Dr. Piper did not respond to the FCE before August 24, 2005, the date on which Defendants denied Plaintiff's benefits.

Plaintiff next saw Dr. Granberg on September 2, 2005. At this appointment she reported that she had noticed good relief of her left lower back pain from the sacroiliac joint injections. She stated that during the FCE she "had marked increases of pain in her lower back with radiation . . . to her knee." She stated that her pain was exacerbated to the point that she went to the emergency room on July 14, 2005, and stated that she has been taking Percocet since the FCE and "has noticed slow resolution of her pain." Dr. Granberg prescribed Hydrocodone APAP again, along with a trial of caudal epidural steroid injection. That injection took place on September 6, 2005. Plaintiff returned to Dr. Granberg on September 27, 2005, and she reported that the procedure "made things a little better." Another injection was prescribed, along with Vicodin 5/500.

Plaintiff saw Dr. Piper on September 27, 2005. The notes from this appointment state that Plaintiff "has had three injections now at the pain service" and that while some days she felt some

improvement in her pain, she was still experiencing "by and large still pretty persistent discomfort" as the pain went down her leg. The report details numbness in her hands and left arm that occasionally would awaken plaintiff at night and made simple daily activities difficult. After this appointment, nurse practitioner Christopher Hemmer wrote a letter that is contained in Plaintiff's administrative record. This letter is dated September 27, 2005, and states that Plaintiff is "essentially totally disabled from any type of gainful employment even that of a sedentary nature." The letter states that she experiences "continued difficulties in the sacroiliac joint requiring pain management evaluation and injections."

Plaintiff had a CT scan of her pelvis on October 5, 2005. The scan found "mild osteoarthritic changes involving both sacroiliac joints, right greater than left." Plaintiff was referred to Metro Rehab Physicians for nerve conduction studies. This testing was completed on October 11, 2005. The therapist performed nerve conduction studies which produced normal results, but also found left carpal tunnel syndrome. Plaintiff returned to Dr. Granberg on October 21, 2005. She stated that she continues "to have significant pain in her low back and down her extremities." She reported that "she did not receive significant benefit with her last injection, but would like to proceed" with another injection. The injection was administered to Plaintiff later that day and Dr. Granberg instructed her to continue Percocet p.r.n. and prescribed Vicodin 5/500.

Plaintiff met with Dr. Granberg on November 29, 2005 and stated that the previous injection provided "partial relief," relieving about 30% of her pain. Dr. Granberg issued a prescription for Vicodin 5/500 and directed her to St. Peters Bone & Joint Surgery for treatment "regarding her recent neck pain for further recommendations which possibly could include injection series such as cervical epidurals."

The records from her December 20, 2005 appointment with Dr. Piper state that Plaintiff has had three caudal epidural steroid injections and three sacroiliac joint injections, but that she "continues with difficulties." The report states that Plaintiff "has been off the Neurontin for a while, and that may have also exacerbated her situation." The decision was made to put Plaintiff back on the Neurontin to see if that would help with the numbness she was experiencing in her left leg. Related to her neck pain, the records state that "she is having some stiffness, tightness. Occasional numbness and tingling in the hands, left greater than right." The report found that the tingling in the right hand had seemed to improve. The report details that Plaintiff suffers from "[c]ervicalgia with intermittent numbness," and noted degenerative disc disease around vertebra C5-6 in Plaintiff's neck.

Her records from an appointment with Dr. Piper on January 10, 2006 state that they "will have the pain service evaluate her for epidural steroid injections." Dr. Piper responded to the FCE on January 24, 2006. His letter is included in the administrative record. This letter explained Plaintiff's medical condition and states that he felt that Plaintiff's "problem was with sedentary positions, i.e. prolonged or protracted sitting or standing, which to my way of evaluating the [FCE] was not addressed specifically . . . [the FCE tests were] not representative of what she had to do on her typical or sedentary job." He states that she may have "degenerative disks at other disk levels and not atypically these are most symptomatic when the patient is sedentary, i.e. sitting or standing." He concludes that his opinion is that "she continues to be disabled as not qualified for gainful employment."[9]

## B.    LEGAL STANDARD

---

[9] Dr. Piper acknowledged that Plaintiff's status as disabled may change. His letter concludes that "it would be necessary in order to be current to see her again, check x-rays and reevaluate her complaint."

As the legal standard is stated in full above, the Court will merely reiterate that a court may grant a motion for summary judgment only if all of the information before that court shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)

## C.    STANDARD FOR REVIEWING BENEFITS DENIAL

"Under ERISA, a plan participant may bring a civil action to 'recover benefits due to him under the terms of his plan, to enforce his right under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Pralutsky v. Metropolitan Life Ins. Co.*, 435 F.3d 833, 837 (8th Cir. 2006) (*quoting* 29 U.S.C. § 1132(a)(1)(B)). The Parties disagree over what standard of review should be applied to this action.

"[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Ratliff v. Jefferson Pilot Financial Ins. Co.*, 489 F.3d 343, 345-46 (8th Cir. 2007) (*quoting Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). If "the plan expressly gives the administrator discretion to determine eligibility for benefits and to construe the terms of the plan, an abuse of discretion standard applies." *Ratliff*, 489 F.3d at 346 (*quoting Heaser v. Toro Co.*, 247 F.3d 826, 833 (8th Cir. 2001). The Court finds that Defendant DRMS lacked the discretion and authority to deny Plaintiff's benefits under the terms of the Plan, and the review of the benefits determination will be made under a *de novo* standard.

The Plan granted Defendant AIG Inc. discretion and authority to determine benefit eligibility. Specifically, page 30 of the Plan states:

> **Who interprets policy terms and conditions?**
>
> **American International Life Assurance Company of New York** has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

However, no plan provision permits Defendant AIG Inc. to delegate this "discretion and authority." Defendants have not directed the Court to any Plan provision permitting delegation, and the Court's inquiry has not uncovered any language authorizing the delegation of this discretion and authority.

It is well established "that an ERISA plan may authorize the plan sponsor to delegate the sponsor's discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *McKeehan v. Cigna Life Ins. Co.*, 344 F.3d 789, 793 (8th Cir. 2003). However, any such delegation must be "explicitly authorized by the plan instrument." *Culp, Inc. v. Cain*, 414 F. Supp. 2d 1118, 1126 (M.D. Ala. 2006). The Statement of Uncontroverted Material Facts submitted with both Defendant DRMS's and the AIG Defendants' Motions state that Defendant DRMS is the claims administrator and has discretionary authority to adjudicate benefit claims. However, the delegation of this authority to Defendant DRMS was not explicitly authorized by the Plan. *See Shane v. Albertson's Inc. Employees' Disability Plan*, 381 F. Supp. 2d 1196, 1201 (C.D. Cal. 2005). As the terms of the plan did not give Defendant DRMS the authority to determine benefit eligibility, this decision is not entitled to review for abuse of discretion, but instead this decision must be evaluated through a *de novo* review.

## D.      DISCUSSION

The administrative record contains a voluminous amount of medical evidence upon which the decision to terminate Plaintiff's benefits was made. The principle question before the Court is whether Plaintiff was disabled under the terms of the plan. On a *de novo* review of a benefits

denial, "'a trial court *must* consider all of the provisions of a policy in question if those provisions are proffered to the trial court as a reason for the denial of coverage,' even where 'not relied upon by the plan administrator at the time the denial was made.'" *Hillstrom v. Kenefick*, 484 F.3d 519, 528 (8th Cir. 2007) (*quoting Weber v. St. Louis Univ.*, 6 F.3d 558, 560 (8th Cir. 1993)).

In conducting a *de novo* review, the Court "owes the administrator no deference, [however] the administrator's decision is still the decision under review." *Niles v. American Airlines, Inc.*, 2008 WL 711630, at *5 (10th Cir. March 17, 2008). The question for the Court to answer is "not whether 'some evidence' or 'substantial evidence' supported the administrator's decision; it is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review." *Id.* (*quoting Alexander v. Winthrop, Stimson, Putnam & Roberts Long Term Disability Coverage*, 497 F. Supp. 2d 429, 433, 440 (E.D.N.Y. 2007). The Court must determine "whether Plaintiff is disabled under the terms of the plan[,] . . . Plaintiff must carry the burden to prove that she was disabled under the meaning of the plan." *Leick v. Hartford Life and Acc. Ins. Co.*, 2008 WL 1882850, at *1 (E.D. Cal. April 24, 2008) (*quoting Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003)).

Accordingly, the Court's analysis begins by reviewing the relevant Plan provisions, interpreting the terms of the Plan through principles of contract interpretation and the law of trusts. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112 (1989); *Balestracci v. NSTAR Elec. & Gas Corp.*, 449 F.3d 2224, 230 (1st Cir. 2006). The Plan states that after a participant receives benefits for twenty four months, the participant must show that they are "prevented performing one or more of the Essential Duties of Any Occupation." The Plan defines

"Any Occupation" to include "an occupation for which [the participant is] qualified by education, training or experience."

In determining whether Plaintiff is disabled under the terms of the Plan, the Court considers the documents admitted into the administrative record prior to the Court deeming the administrative process to be exhausted. The only evidence in the administrative record that truly supports a denial of benefits are the results from the July 12, 2005 FCE. The FCE found that Plaintiff was no longer disabled because she objectively demonstrated the ability to perform "light work" on a full time basis or "medium work" on less than a full time basis. The FCE states that Plaintiff "gave inconsistent, yet maximum effort, and today's test appears to be a true representation of this client's current functional capabilities."

The Court finds that the FCE results are not truly indicative of Plaintiff's ability to "perfor[m] one or more of the Essential Duties of Any Occupation." The findings from the FCE are based on Plaintiff's ability to exert force, and not based on any measure or determination of pain, nor is it based on any evaluation of Plaintiff's ability to perform the tasks of sedentary employment. The Court also questions the duration of the test. Plaintiff's FCE lasted for three hours.[10] The length of this FCE reduces the probative value of the test results. A three hour exam simply does not provide "evidence as to her abilities for a longer period." *Stup v. UNUM Life Ins. Co. of America*, 390 F.3d 301, 309 (4th Cir. 2004). The FCE only tested Plaintiff's ability to perform certain physical activities over a short period of time, and the results "do not

---

[10] Plaintiff's appointment was for 8:00 a.m. on July 12, 2005. The Court has reviewed the record, and many of the FCE test results include a time stamp from when that test was conducted. The last time stamp was recorded at 10:03 a.m., and while Defendants assert that the length of the FCE is a controverted fact, Defendants have not submitted any evidence that the examination lasted beyond this point.

necessarily indicate [Plaintiff's] ability to perform sedentary work for an eight (or even four-) hour workday, five days a week." *Id.*

The Court is further persuaded that Plaintiff's reports of pain during and after the exam support the inaccuracy of the FCE. "Post test, she rates her pain 9/10 with shooting pains in the back of the leg to the knee. She has numbness in her foot and her back and left hip are aching a lot." The report also noted that Plaintiff was "crying throughout the entire circuit." Additionally, Plaintiff's medical records indicate that she procured a prescription for Hydrocodone APAP 5/500 the day after the exam due to the pain she was in from the FCE, and she reported to her treating physician that she had to seek treatment at the emergency room for her pain thirty hours after the exam. Additionally, at an appointment six weeks after the FCE, she stated that she had been taking Percocet since the FCE and "has noticed slow resolution of her pain." This evidence strongly suggests that while Plaintiff may be able to isometrically push with 50 pounds of force and pull with a force of 43 pounds, or complete other similar activities over a short period of time, there is no evidence that she is able to perform these tasks, or perform sedentary work, over the course of a normal eight-hour day and forty-hour week.

A "FCE measures the residual occupational abilities of a patient per National Institute for Occupational Safety and Health Guidelines." *Ebert v. Reliance Standard Life Ins. Co.*, 171 F. Supp. 2d 726, 732 (S.D. Ohio 2001). Accordingly, the usefulness of the results of a FCE are extremely limited. It is important to note that "that tests of strength such as a [FCE] can neither prove nor disprove claims of disabling pain." *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261, 296 (W.D. Pa. 2008).

When Defendants determined that Plaintiff was not entitled to disability benefits under the "any occupation" standard, Plaintiff's medical records did not contain any information supporting

a finding that there was any substantial change in Plaintiff's condition from when it was determined that she was disabled under the initial "your occupation" standard. Plaintiff has continued to experience pain throughout this period. She has undergone a variety of treatments for her pain, with varying degrees of success, however, no treatment has provided Plaintiff with any significant lasting improvement.

Plaintiff's medical providers all indicate that Plaintiff is disabled from even light work. On January 14, 2005, Dr. Piper sent a letter to Defendant DRMS stating that "because of persistent symptoms and debilitating donor side pain and paraesthesias in both legs despite medications, injections and the like, that ordinary requirements for even a sedentary position would be too exhaustive and taxing." He concludes that he suggested to Plaintiff "that she not return to gainful employment even despite her position being a sedentary one." Nurse practitioner Christopher Hemmer wrote a letter dated September 27, 2005, and this letter states that Plaintiff is "essentially totally disabled from any type of gainful employment even that of a sedentary nature." The letter states that she experiences "continued difficulties in the sacroiliac joint requiring pain management evaluation and injections." Finally, Dr. Piper responded to the FCE on January 24, 2006 with a letter indicating his opinion that "she continues to be disabled as not qualified for gainful employment."

Administrators do not have to "accord special weight to the opinions of a claimant's physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 882, 834 (2003). However, they cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). The opinions provided by Dr. Piper and Mr. Hemmer correspond with the treatment Plaintiff was receiving. Plaintiff has been prescribed drugs, patches, injections and compression stockings for

her pain. The preponderance of the evidence demonstrates that this pain is persistent, ongoing, and disabling. The medical evidence presented by Plaintiff cannot be outweighed by the results of the July 12, 2005 FCE. The preponderance of the evidence demonstrates that Plaintiff is disabled under the terms of the plan. Plaintiff's pain prevents her "from performing one or more of the Essential Duties of Any Occupation."

### E. CONCLUSION

The Court finds that Plaintiff's benefits should be reinstated. Plaintiff has established that Defendants' decision to discontinue her disability benefits was erroneous under the terms of the Plan and in light of the evidence presented. The Court will therefore enter Judgment in favor of Plaintiff on Claim III of Plaintiff's Complaint. Plaintiff is entitled to benefits due under the Plan since August 24, 2005. Plaintiff is entitled to future benefits under the Plan to the extent that she continues to qualify under the terms of the Plan.


Accordingly,

**IT IS HEREBY ORDERED** that Motion for Summary Judgment [doc. #98] is **DENIED.**

**IT IS FURTHER ORDERED** that American International Group, Inc., American International Group, Inc. Long Term Disability Plan and American International Life Assurance Company of New York's Motion for Summary Judgment [doc. #100] is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment [doc. #102] is **GRANTED.** The Court will therefore enter Judgment in favor of Plaintiff on Claim III of Plaintiff's Complaint. Plaintiff is entitled to benefits due under the Plan since August 24, 2005.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to File Supplemental Motion for Summary Judgment [doc. #116] is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Supplemental Motion for Summary Judgment [doc. #116-2] is **GRANTED, in part, and DENIED, in part.** The Court **GRANTS** summary judgment on Count II of Plaintiff's Complaint; Defendants must produce the administrative services contract to Plaintiffs within ten days from the date of this order. This document shall be produced through the Court's CM/ECF system. It is to be filed under seal and may be used by the Parties for the purposes of this action only, and may not be disclosed to any third parties. The Court **DENIES** summary judgment on Count I of Plaintiff's Complaint as there is a genuine issue of material fact.

**IT IS FURTHER ORDERED** that Plaintiff's Combined Motion to Strike New Assertion of Fact and Arguments First Presented in Defendant DRMS' Reply Brief in Support of Its Motion for Summary Judgment or, in the alternative, Motion for Leave to File Surreply to Address Such New Assertion of Fact and Arguments and Memorandum in Support Thereof [doc. #117] is **GRANTED in part, and DENIED, in part.** Plaintiff's Motion to Strike is **DENIED**, but Plaintiff's Motion for Leave to File Surreply is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Combined Motion to Strike New Assertion of Fact and Arguments First Presented in the AIG Defendants Reply Brief in Support of Its Motion for Summary Judgment or, in the alternative, Motion for Leave to File Surreply to Address Such New Evidence, Assertions of Fact and Arguments and Memorandum in Support Thereof [doc. #118] is **GRANTED in part, and DENIED, in part.** Plaintiff's Motion to Strike is **DENIED**, but Plaintiff's Motion for Leave to File Surreply is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Combined Motion for Leave to Notify the

Court of New Authority and Proposed Notice [doc. #122] is **GRANTED.**

Dated this <u>15th</u> Day of <u>September</u>, 2008.


_E. Richard Webber_
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE